IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

S.M., M.M., and B.B.,

  Plaintiffs,

  v.

GEORGE ARLOTTO, *et al.*,

  Defendants.

Civil Action No. RDB-17-3294

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiffs S.M., a minor student, and his parents M.M. and B.B. (collectively, "Plaintiffs") bring this action against Anne Arundel County Board of Education and George Arlotto (collectively, "Defendants"), challenging the decision of Administrative Law Judge Daniel Andrews of the Maryland Office of Administrative Hearings dismissing Plaintiffs' Due Process Complaint and determining that S.M. was not denied a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, for his third, fourth, and fifth-grade school years. Defendants have filed a cross-motion for summary judgment, submitting that the judgment should be upheld in their favor. The parties' submissions and the full administrative record have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2016). For the following reasons, Plaintiffs' Motion for Summary Judgment (ECF No. 11) is DENIED and Defendants' Motion for Summary Judgment (ECF No. 16) is GRANTED, and this Court accordingly upholds the decision of the Administrative Law Judge.

# BACKGROUND

## I. The Individuals with Disabilities Education Improvement Act ("IDEA")

Congress enacted the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, "to ensure that all children with disabilities have available to them a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." § 1400(d)(1)(A); *Fry v. Napoleon Community Schools*, 137 S. Ct. 743, 748 (2017). To ensure the delivery of a FAPE, the IDEA requires a school district to provide an Individualized Education Program ("IEP") for each child determined to be learning disabled. 20 U.S.C. § 1414(d). As the United States Supreme Court recently stated in *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017), "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." 137 S. Ct. at 999.

Under this standard, the IDEA does not "require that a school district provide a disabled child with the best possible education." *M.L. v. Smith*, No. PX-16-3236, 2018 WL 3756722, at *1 (D. Md. Aug. 7, 2018) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., v. Rowley*, 458 U.S. 176, 192, 102 S. Ct. 3034 (1982)). The "fact-intensive exercise" of creating an IEP is "informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." *Endrew F.*, 137 S. Ct. at 999. "[R]eview of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* (emphasis in original).

The IEP document itself "addresses the student's current educational status, annual educational goals, the need for special educational services or other aids necessary to help meet those goals, and whether the child may be educated in [a] regular school classroom with non-disabled students." *M.L.*, 2018 WL 3756722, at *1 (citations omitted). On the latter point, the IDEA contains a "least restrictive environment" provision that states:

> To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1415(a)(5). Parents can accept or reject a finalized IEP. If the parents reject the IEP, they may file a Due Process complaint with an Administrative Law Judge ("ALJ"). § 1415(f). While waiting for the disposition of that proceeding, parents may enroll their child in private education and seek reimbursement from the state. *M.L.*, 2018 WL 3756722, at *1. Finally, either party may challenge the decision of the ALJ by filing suit in the appropriate state court or district court of the United States. § 1415(i).

## II.    Factual Background[1]

S.M. was born in March of 2006. (P. Exh. 1.) At all relevant times, Anne Arundel County Public Schools ("AACPS") has been responsible for his education. (*Id.*) Prior to first grade, S.M. was identified by AACPS as a student who qualified for an Individualized Education Program ("IEP") under the IDEA. The Plaintiffs challenge the appropriateness

---

[1] A majority of the background of this case is undisputed as presented in the ALJ's decision. As explained below, this Court gives the factual determinations of the ALJ appropriate deference. The exhibits are referred to as they were admitted at the Due Proceed hearing, and citations to the record conform to the following format: Plaintiffs' exhibits appear as "P. Exh. __" and Defendants' as "AACPS Exh. __."

of the IEPs that AACPS provided S.M. for his 2014-2015, 2015-2016, and 2016-2017 school years (third through fifth grade). While the Parents were barred by the applicable statute of limitations from asserting a Due Process claim related to S.M.'s IEP for the 2013-2014 school year (second grade),[2] that was S.M.'s last year in AACPS and is discussed below as relevant background information.

### a. 2013-2014 School Year (Second Grade)

For S.M.'s second grade school year, 2013-2014, AACPS established an IEP that identified him as having a primary disability of developmental delay and his affected areas as fine motor, reading, math, written expression, and requisite learning.[3] (P. Exh. 3.) Under Present Level of Academic Achievement and Functional Performance for each school subject matter, the IEP noted that S.M. was on grade level for (i) reading, (ii) math, (iii) written expression, and (iv) requisite learning skills, although the IEP noted that he had difficulty competing a task without a verbal prompt and remaining focused in a large group setting. (*Id.*) The IEP then provided that S.M. would receive the following services at Davidsonville Elementary, S.M.'s home school:

- 7.5 hours of special education services per week in a co-taught, general education setting for language arts (2.5 hours), math (4 hours), and requisite learning (1 hour).
- Instructional and testing accommodations and several supplementary aids, services, program modifications, and supports.
- 30 minute occupational therapy sessions twice per month.

---

[2] The IDEA contains a two-year statute of limitations. *See* 20 U.S.C. § 1415(f)(3)(C) ("A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint . . ..") The Parents did not file their Due Process complaint until February 3, 2017. Therefore, any claim relating to the 2013-2014 school year was barred by the statute of limitations.

[3] "Requisite learning" covers learning behavior issues such as organization, attention, and the ability to transition. (ALJ Decision at 49.)

The "co-taught" classes contained both a general education teacher and a special education teacher who provided particularized instruction to the special education students. (May 19, 2017 Tr. at 55-56.) The instructional and testing accommodations included a scribe for writing, extended time and multiple or frequent breaks, and reduced distractions for S.M. (P. Exh. 3.) Among the supplementary aids, services, programs modifications and supports provided were check for understanding, repetition of directions, have S.M. paraphrase directions/information, preferential seating in the front and center, monitor all work with frequent check ins, use of alternative paper, reduce information on the page to avoid visual overload, enlarge font, provide visual and physical breaks, and use of guided reader. (*Id.*) Plaintiffs assert, however, that it quickly became apparent that "these services were woefully inadequate and inappropriate for addressing S.M.'s unique needs." (ECF No. 11 at 6.)

There were at least five IEP team meetings during S.M.'s second grade year. (P. Exhs. 6, 9, 13, 18, 34.) In addition, a communication log was instituted between the school and Parents. The IEP Reports reflect that the Parents expressed concerns about S.M.'s progress in math and language arts. During the October 29, 2013 team meeting, the parties discussed S.M.'s score on the Dynamic Indicators of Basic Early Literacy Skills ("DIBELS") Assessment, in which S.M. scored "CORE," meaning he was working at grade level. (P. Exh. 9.) A few months later, during the February 11, 2014 meeting, AACPS noted that S.M. was also considered an on grade level reader. (P. Exh. 13.) The Parents noted concerns, however, about S.M. meeting his IEP goals for the year and grasping the regular education curriculum. (*Id.*) The Parents also expressed concerns that S.M. was not consistently receiving some of his instructional and testing accommodations. (P. Exh. 5.)

In March of 2014, the Parents sent S.M. for a neuropsychological evaluation by Dr. Julie Newman at the Children's National Medical Center. (P. Exh. 17.) In her findings, Dr. Newman noted that S.M. "had difficulty with task persistence, and would tend to 'give up' easily. However, he would put forth additional effort when prompted/encouraged, albeit reluctantly." (*Id.* at 3.) Dr. Newman concluded that S.M. had relative weaknesses in executive function, phonological awareness, visual-motor integration, and sustaining attention and effort, although she determined that S.M. did not currently meet the criteria for Attention Deficit Hyperactivity Disorder. (*Id.* at 4, 6.) She also concluded that S.M. had relative strengths in overall cognitive reasoning/intelligence, language, visual-spatial, and memory abilities. (*Id.* at 6.) Of her several school-based recommendations, Dr. Newman stated "[S.M.] would be best suited to a medium sized class (i.e. 12-18 students) with increased access to individualized instruction. Placement in a larger (i.e. ≥ 20 students) class is not an appropriate learning environment." (*Id.* at 7.)

On June 17, 2014, AACPS and the Parents met for an IEP meeting to review S.M.'s IEP and make any necessary revisions. (P. Exh. 34.) S.M.'s Parents brought an educational consultant, Jenner Engel Fisher. (*Id.*) The parties discussed the goals and objectives of the IEP, and Ms. Fisher expressed concern about the school's accommodations for S.M. (*Id.*) When the Parents subsequently received a copy of the draft 2014-2015 IEP, they requested additional accommodations and supplementary aids and services and noted concerns including "class size – can [S.M.] be successful in a class of 25+ kids." (P. Exhs. 35, 36.)

**b. 2014-2015 School Year (Third Grade)**

For S.M.'s third grade school year, 2014-2015, AACPS established an IEP that

identified him as having a primary disability of specific learning disability, and his affected areas as fine motor, reading, math, written expression, and requisite learning schools. (P. Exh. 31.) Under Present Level of Academic Achievement and Functional Performance for each school subject matter, the IEP noted that as to (i) reading, S.M. was on grade level for sight words and comprehension, but on a first grade level for decoding; (ii) math, S.M. was on grade level for numerical operations, but on mid and end-of first grade levels for problem solving and math fluency, respectively; (iii) written expression, S.M. was at mid-first grade levels for alphabet writing fluency, sentence composition, and spelling; and (iv) as to fine motor and requisite learning skills, S.M. was below expectations. (*Id.*) The IEP then provided that S.M. would receive the following services at Davidsonville Elementary:

- 20 hours of extended school year education services during the summer of 2014 for reading and math.
- 10.5 hours of special education services per week in a co-taught, general education setting for language arts (5 hours), math (5 hours), and requisite learning (30 minutes).
- 30 minutes of self-contained, "pull-out" class services taught specifically by a special education teacher outside of the general education per week for requisite learning.
- Instructional and testing accommodations and several supplementary aids, services, program modifications, and supports.
- 30 minute occupational therapy sessions three times per month during the school year, and one thirty minute session during the summer of 2014.

The self-contained, "pull out" class services included no more than five students and involved pre-teaching, re-teaching, and skill remediation. (May 19, 2017 Tr. at 56.) The instructional and testing accommodations included large print, human reader or audio recording for selected portions of tests, visual cues, a scribe, respond on test book, monitor test response, visual organizers, extended time, multiple or frequent breaks, and reduced

distractions. (P. Exh. 31.) Among the supplementary aids, services, program modifications and supports were use of a highlighter, organizational aid, frequent or immediate feedback, reduced amount to copy from board, copy of teacher/student notes, specialized word processing software, reduced visual cluster, enlarged font, and use of a move and sit cushion and toggle chair. (*Id.*)

In August of 2014, the Parents notified AACPS that they rejected the IEP for S.M.'s third grade year because it provided for S.M. to be taught in the general educational setting ranging from 20-25 student class sizes. They did not believe that the IEP sufficiently emphasized S.M.'s issues with attention, dyslexia, or work avoidance behaviors. Therefore, they notified AACPS that they were enrolling him in a full-time, non-public special education at the Summit School ("Summit") and would be seeking public funding for his placement. (P. Exh. 39 at 14.)

Toward the end of S.M.'s third grade school year, in May of 2015, counsel for the Parents sent AACPS a letter indicating that S.M. had "flourished" during his year at Summit and requested that AACPS convene an IEP meeting to revise S.M.'s IEP accordingly. (P. Exh. 43.) In response, Dan Seitz and Lori Kane went to observe S.M. in class at Summit. (AACPS's Exh. 9.) In addition, the Parents also had their educational consultant Fisher observe S.M. at Summit. (P. Exh. 45.) Notably, S.M.'s largest class size at Summit had a ratio of five students to one teacher.

On June 19 and 29, 2015, IEP team meetings were held to review S.M.'s IEP and make any necessary revisions. (AACPS Exhs. 3, 4.) The Parents, their counsel, and Ms. Fisher attended the meetings. (*Id.*) At the first meeting, seven individuals attended on behalf

of the school, including the Principal, Vice Principal, three teachers, an occupational therapist, and a compliance specialist. (AACPS Exh. 3.) Following discussions concerning the various individuals' observations of S.M., the parties reviewed the draft IEP. (*Id.*) Additions and alterations were made to present levels of academic achievement and functional performance, and the parties added instructional and testing accommodations, supplementary aids, services, program modifications, and supports. (*Id.*) The parties also adjusted S.M.'s goals in several areas. (*Id.*) During the second meeting, the Parents expressed concerns about the size of S.M.'s proposed classes at Davidsonville. (*Id.*) Ms. Fisher explained that S.M.'s ability to be productive and listen to instructions was impacted by class size, and a higher number of students negatively impacted his academic success. (*Id.*) Therefore, the Parents did not believe that S.M.'s IEP could be implemented at Davidsonville because S.M. could not be placed in small classes full time.

### c. 2015-2016 School Year (Fourth Grade)

For S.M.'s fourth grade school year, 2015-2016, AACPS established an IEP that identified him as having the same primary disability, and his affected areas as reading, math, written expression, fine/visual motor, and learning behaviors. (AACPS Exh. 2.) Under Present Level of Academic Achievement and Functional Performance for each school subject matter, the IEP noted that as to (i) reading, S.M. was on grade level for decoding, but at a beginning of third grade level for comprehension; (ii) math, S.M. was on a second grade level; (iii) written expression, S.M. was on a second grade level; and (iv) as to fine/visual motor skills and learning behaviors, S.M. was below expectations. (*Id.*) The IEP then provided that S.M. would receive the following services at Davidsonville Elementary:

- 8.5 hours of special education services per week in a co-taught, general education setting for language arts (5 hours), math (2.5 hours), and requisite learning (1 hour).
- 5 hours of self-contained, "pull-out" class services taught specifically by a special education teacher outside of the general education per week for language arts (2.5 hours) and math (2.5 hours).
- Instructional and testing accommodations and several supplementary aids, services, program modifications, and supports.
- 30 minute occupational therapy sessions three times per month during the first quarter of the school year, and one thirty minute session per month during the remainder of the school year.

As a part of S.M.'s special education in language arts, he would also receive reading intervention instruction focusing on his weaknesses such as reading comprehension or decoding. (May 19, 2017 Tr. at 56.) The instructional and testing accommodations included the same from the prior year, plus notes and outlines and mathematics tools and calculation devices. (AACPS Exh. 2.) The supplementary aids, services, program modifications, and supports also included the same from the prior year plus frequent reminders of rules and adult support. (*Id.*) Despite the increases in educational services, accommodations, and aids, the Parents objected to the IEP and notified AACPS that they would be placing S.M. at Summit School for the 2015-2016 school year and seeking funding for the placement.

In March of 2016, the Parents' counsel sent AACPS a neuropsychological report of S.M. prepared by Dr. Vincent Culotta. Dr. Culotta diagnosed S.M. with Specific Learning Disability with Impairments in Reading and Mathematics, a Developmental Coordination Disorder with Dysgraphia, an Attention-Deficit/Hyperactivity Disorder-Combined Presentation, and an Anxiety Disorder-Unspecified. (AACPS Exh. 14.) On a Woodcock Johnson IV Test, S.M. scored in the low average to average range in broad reading, basic reading skills, and comprehension and oral reading; low average range to borderline in

mathematics; and low average range to borderline in written language. (*Id.*) Once AACPS received the report, Daniel Seitz and Sharon Layman went to observe S.M. at Summit and spoke with various individuals at the school. (AACPS Exh. 25.)

On August 9, 2016, the Parents and AACPS met to discuss S.M.'s IEP for the 2016-2017 school year.[4] (AACPS Exh. 19.) The school had sent the Parents a draft IEP two months prior on June 6, 2016. (*Id.*) The school asserts that three days prior to the August 9 meeting, the Parents submitted to AACPS additional testing and progress reports prepared by Summit. (ECF No. 16-1 at 7.) Although AACPS indicated that three days was an insufficient time to review the additional reports, the Parents refused to reschedule. (*Id.*) Subsequently, at the August 9, 2016 meeting, the Parents assert that the school's team ignored S.M.'s progress at the Summit school and instead focused on S.M.'s decline on his most recent Woodcock-Johnson IV testing. (ECF No. 11 at 18.)

### d. 2016-2017 School Year (Fifth Grade)

For S.M.'s fifth grade school year, 2016-2017, AACPS established an IEP identifying S.M. with the same primary disability and affected areas. (AACPS Exh. 13.) Under Present Level of Academic Achievement and Functional Performance for each school subject matter, the IEP noted that as to (i) reading, S.M. was at a beginning of fourth grade level; (ii) math, S.M. was at a third grade level; (iii) written expression, S.M. was at a third grade level; and (iv) as to fine/visual motor skills and learning behaviors, S.M. was moderately below and significantly below expectations, respectively. (*Id.*) The IEP then provided that S.M. would receive the following services at Davidsonville Elementary:

---

[4] AACPS asserts that it attempted to arrange an IEP meeting with the Parents and their counsel for several months. (AACPS Exh. 16.)

- 5 hours of special education services per week in a co-taught, general education setting for language arts.
- 8 hours and 20 minutes of self-contained, "pull-out" class services taught specifically by a special education teacher outside of the general education per week for language arts (2.5 hours) and math (5 hours 50 minutes).
- Instructional and testing accommodations and several supplementary aids, services, program modifications, and supports.
- 30 minute occupational therapy sessions twice per month during the first quarter of the school year, and one thirty minute session per month during the remainder of the school year.

Again the Parents rejected the IEP and placed S.M. at Summit, noting in a subsequent letter that "[S.M.] is currently receiving specialized instruction and interventions that are appropriate for his disabilities and is receiving the small class seizes he needs to be successful." (P. Exh. 72.) In response, AACPS again requested to observe S.M. at Summit. Thereafter, Cynthia Heslin, a Non-Public Specialist with the AACPS Department of Special Education, observed S.M. and prepared a record of observation for reading, written expression, and math. (P. Exh. 78.)

On November 29, 2016, the parties met for another IEP Team Meeting to review S.M.'s IEP and make any necessary revisions. (AACPS Exh. 29.) During the meeting, the parties reviewed Ms. Heslin's observations and the testing and reports the school had previously received on August 6, 2016. (ECF No. 16-1 at 33.) The notes from the Meeting indicate that the Parents stressed that S.M. benefits from classes with a lower teacher student ratio because of the impact inattention has on his performance. (AACPS Exh. 29.) From Ms. Heslin's observations and the additional testing and reports, AACPS updated S.M.'s present levels of performance and determined that S.M. needed additional services then those proposed in the August 2016 IEP. (AACPS Exh. 29.) The updated IEP then provided that

S.M. would receive the following services at Central Elementary School:

- 2.5 hours of special education services per week in a co-taught, general education setting for science and social studies.
- 15 hours of self-contained, "pull-out" class services taught specifically by a special education teacher outside of the general education per week for language arts and math.
- Instructional and testing accommodations and several supplementary aids, services, program modifications, and supports.
- 30 minute occupational therapy sessions twice per month during the first quarter of the school year, and one thirty minute session per month during the remainder of the school year. [5]

Unlike the prior IEPs, these services could not be offered at Davidsonville Elementary. Rather, the IEP provided that S.M. would attend the closest AACPS school that could offer the services, Central Elementary School ("Central").

The Parents objected to the proposed education hours and placement at Central Elementary School. They asserted that "such a program was not full-time and would not account for S.M.'s significant attentional issues during co-taught classes such as social studies and science." (ECF No. 11 at 21.) When the Parents visited Central, they assert that they observed a lack of class management, "uninvolved students, constant distractions, lack of learning, and verbal abuse by one teacher." (*Id.*) Therefore, the Parents continued S.M.'s placement at Summit School for the remainder of the school year.

III.    **Procedural Background**

On February 3, 2017, B.B. and M.M. filed a Due Process Complaint with the Office of Administrative Hearings against Anne Arundel County Public Schools ("AACPS"), requesting reimbursement for the costs of placing S.M. at the Summit School for the 2014-

---

[5] The parents assert that initially, the school offered an IEP that provided for the same education services as the prior IEP. After taking a break, however, the school proposed this IEP.

2015, 2015-2016, and 2016-2017 school years. (P. Exh. 1.) Thereafter, Daniel Andrews, Administrative Law Judge, held a nine-day Due Process hearing, during which nine witnesses testified and eighty-seven exhibits were introduced into the record. The Plaintiffs called four witnesses: their educational consultant, Jenner Engel Fisher; one of S.M.'s teachers from Summit, Angela Stolz; Dr. Vincent Culotta; and S.M.'s mother, Plaintiff B.B. The thrust of each witness's testimony was that the IEPs were not calculated to permit S.M. to make meaningful progress because they did not provide for full-time, self-contained education which was necessary given S.M.'s attention and distraction issues. On the other hand, AACPS called five witnesses who responded that each IEP was calculated to permit S.M. to make meaningful progress through the provision of specialized education, supplementary aids and services, and instructional and testing accommodations.

On July 14, 2017, the ALJ denied the Parents' Due Process Complaint, holding that the Parents failed to prove that AACPS denied S.M. a FAPE for the 2014-2015, 2015-2016, and 2016-2017 school years. (P. Exh. 1.) The ALJ held that while the evidence showed that S.M. had difficulties with inattention and distractibility, the evidence also demonstrated that he would make educational progress under the IEPs through the use of supplemental aids, services, program modifications, and supports. (ALJ Decision.) Therefore, he held that the IEPs were reasonably calculated to enable S.M. to make educational progress and provided him with a FAPE for each school year. Pursuant to the IDEA, the Parents appealed the ALJ's decision to this Court on November 7, 2017. (ECF No. 1.)

## STANDARD OF REVIEW

In Individuals with Disabilities Education Improvement Act ("IDEA") cases, this

Court conducts "modified de novo review, giving due weight to the underlying administrative proceedings." *M.L. by Leiman v. Smith*, 867 F.3d 487, 493 (4th Cir. 2017) (quoting *O.S. v. Fairfax Cty. Sch. Bd.*, 804 F.3d 354, 360 (4th Cir. 2015)); *E.S. v. Smith*, No. No. PWG-17-3031, 2018 WL 3533548 (D. Md. July 23, 2018). "While the court must make an independent determination on whether the school complied with the IDEA, the hearing officer's factual findings are considered prima facie correct." *Id.* (quoting *O.S.*, 804 F.3d at 360). The question of whether an IDEA is adequate "is itself a question of fact." *Id.* (quoting *O.S.*, 804 F.3d at 360).

The party seeking relief bears the burden of proving by a preponderance of the evidence that the State failed to provide a free appropriate public education. "As a general matter, IDEA 'plaintiffs face an uphill battle for several reasons, not only because they must bear the burden of proof with respect to the evidence both in the administrative hearing and on appeal, but also because of the degree of deference owed to the administrative proceedings.'" *M.L. v. Smith*, No. PX 16-3236, 2018 WL 3756722, at *5 (D. Md. Aug. 7, 2018) (quoting *R.F. v. Cecil Cty. Pub. Sch.*, No. ADC-17-2203, 2018 WL 3079700, at *15 (D. Md. June 21, 2018)). This Court "cannot 'substitute [its] own notions of sound educational policy for those of local school authorities.'" *E.S.*, 2018 WL 3533548, at *7 (quoting *Barnett v. Fairfax Co. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991), *cert. denied*, 502 U.S. 859 (1991)).

## ANALYSIS

Plaintiffs argue that the ALJ erred in concluding that they did not meet their burden of proving that AACPS denied S.M. a FAPE for the 2014-2015, 2015-2016, and 2016-2017 school years on three grounds: (1) "the ALJ misunderstood the question before him"; (2) the

ALJ's factual findings and witness credibility determinations are improper and not owed deference; and (3) the ALJ erred by concluding that S.M. made meaningful progress at AACPS and ignoring evidence of S.M.'s progress while at Summit. Weaved throughout each argument is the Parents' assertion that in order to make meaningful progress, S.M. needed to be in self-contained classes full time.

## I.     The ALJ properly understood the question before him

The Plaintiffs assert that the ALJ "misunderstood the fundamental issue before him" during the nine-day hearing as a question of whether private placement was appropriate for S.M. rather than whether the IEPs violated the IDEA. (ECF No. 11 at 30.) The Parents begin by noting that although the ALJ cited the applicable law (*id.* at 34), the fourth issue he included in his decision was "[w]hether, during any applicable school year, the Parents private unilateral placement was appropriate?" (ALJ Decision at 3.) This, however, was the *fourth* issue posed by the ALJ; the first three asked whether the AACPS denied S.M. a FAPE for the 2014-2015, 2015-2016, and 2016-2017 school years. (ALJ Dec. at 3.) Had the ALJ determined that AACPS denied S.M. a FAPE for one of those years, in order to receive reimbursement for Summit the Parents would then have had to show that the private education services they obtained were appropriate. *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 70 (1985). Therefore, the ALJ properly posed this fourth issue.

The Parents also emphasize that the ALJ included in his discussion Ms. Layman's opinion that "the Student did not require a self-contained small class setting because, according to Summit reports, the Student was easily directed and could be educated with non-disabled peers." (*Id.* at 62.) Further, the Parents note his discussion of Ms. Donohue's

opinion that S.M. did not require a small class full-time like the Parents asserted and therefore "d[id] not need to be privately placed in a setting like Summit." (*Id.* at 65.) The Parents assert that "this is not the opinion testimony the ALJ should have considered. Instead, he should have considered the appropriateness of the AACPS IEPs for S.M. apart from the question of whether he requires a full-time special education program." (ECF No. 11 at 36.) The ALJ's discussion of these witnesses' opinions, however, ultimately related to whether S.M. could make meaningful progress *not* placed in small classes full time, like the IEPs proposed at Davidsonville and Central. Both Ms. Layman and Ms. Donohue testified that S.M. could be easily redirected, and therefore he could make meaningful progress with a combination of self-contained classes and co-taught classes with supplementary aids, services, and instructional and testing accommodations. Therefore, the ALJ properly understood the issue before him during the nine-day Due Process hearing.

## II. The ALJ's factual findings and credibility determinations are owed deference

Plaintiffs argue that the ALJ's factual findings, including his witness credibility determinations, "were not regularly made and [accordingly] his decision is entitled to no deference." (ECF No. 17 at 2.) Plaintiffs assert that the ALJ excluded relevant and material evidence of S.M.'s progress during the 2013-2014 school year, did not admit certain evidence proffered by the Plaintiffs until AACPS's case-in-chief, and as to credibility determinations, "repeatedly disregarded the parents' expert testimony for improper, sometimes irrational, reasons" and "blindly credit[ed] the opinions of the AACPS witnesses." (ECF No. 17 at 3-7; ECF No. 11 at 38.)

As the United States Court of Appeals for the Fourth Circuit stated in *County School*

*Board v. Z.P.,* 399 F.3d 298, (4th Cir. 2005), "factual findings made during the state administrative proceeding are entitled to a presumption of correctness, so long as the findings were 'regularly made.'" 399 F.3d at 305; *J.P. ex rel. Peterson v. County School Board of Hanover County, Virginia,* 516 F.3d 254, 259 (4th Cir. 2008) ("If the findings are not 'regularly made,' however, they are not entitled to deference."). The "regularly made" inquiry focuses on the process through which the ALJ made his or her findings. *See id.* ("Factual findings are not regularly made if they are reached through a process that is far from the accepted norm of a fact-finding process." (citation omitted)) In *J.P.,* nothing indicated that the ALJ's fact-finding process "was anything other than ordinary" when the ALJ "conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." 516 F.3d at 259; *see also S.T. ex rel. S.J.P.T. v. Howard Cty. Pub. Sch. Sys.,* No. JFM-14-00701, 2015 WL 72233, at *2 (D. Md. Jan. 5, 2015), *aff'd sub nom,* 627 F. App'x 255 (4th Cir. 2016) ("Under this standard, a court should give deference even to a poorly explained administrative decision as long as the hearing officer used standard fact-finding methods." (citing *J.P.,* 516 F.3d)).

The ALJ in this case conducted a nine-day hearing whereby nine witnesses, four called by the Plaintiffs and five by AACPS, testified and eighty-six exhibits were introduced. He then composed a seventy-two page opinion, summarizing teacher reports, psychological reports, test results, observations of S.M., the IEPs, and witness testimony. (ALJ Decision). Like in *J.P.,* "there is nothing in the record suggesting that the hearing officer's process in

resolving the case was anything other than ordinary." 516 F.3d at 259. With respect to the Plaintiffs' argument that the ALJ excluded evidence concerning S.M.'s second grade, 2013-2014, school year, that arguments contradicts the record and the ALJ's first twenty-one findings of facts. (ALJ Decision at 4-8.)

The "regularly made" standard also applies to an ALJ's witness credibility determinations, and an "IDEA hearing officer is not required to offer a detailed explanation of his or her credibility assessments." *M.M. ex rel. J.M. v. Foose*, 165 F. Supp. 3d 365, 378 (D. Md. 2015) (citation omitted). In his decision, the ALJ noted that "[t]his case presents a classic conflict between the credibility of opposing expert witnesses." (ALJ Decision at 67.) In addition to making findings of facts, the ALJ analyzed the Parent witnesses' testimony for over ten pages before turning to the AACPS's contentions. The ALJ credited the testimony of Dr. Culota, explaining that he found it helpful for understanding how S.M.'s ADHD and weaknesses in fine-motor skills and efficiency, perceptual organizational skills, and sustained attention made it more difficult for him to keep up and make educational progress in a general education environment of a 20-25 class size. (*Id.* at 67-68.) However, the ALJ also explained that:

> Dr. Culota failed to sufficiently explain why the Student's disabilities are so complex and so severe that he can only function in a small classroom. . . It is not enough to state that the Student has a learning disability and ADHD, which causes distrability, and then conclude that a small classroom is required for any educational benefit, especially when the evidence shows that the Student is easily redirected. Absent more specific testimony, Dr. Culota's testimony failed to sufficiently address why the supports and services proposed in the IEP would be inadequate to address the Student's needs.

(*Id.* at 68.) The ALJ found a similar deficiency in the testimony of Ms. Fisher. (*Id.* at 69.) The ALJ then analyzed the AACPS witnesses' testimony and similarly found that Ms. Kane and

Ms. Laymon, whom testified that S.M. could gain educational benefit through quality classroom instruction in the general education setting, did not provide "much evidence to support [that] position." (*Id.* at 69-70.) Thus, the ALJ was equally skeptical of these AACPS witnesses. Ultimately, the ALJ found the testimony of Ms. Donohue most persuasive because she listed S.M.'s specific characteristics that would permit him to be successful under the proposed IEPs. (*Id.* at 70.)

The Parents criticize the five AACPS witnesses because they either did not personally observe S.M. at Davidsonville or, in the case of Ms. Donohue, did not observe S.M. at all. (ECF No. 11 at 48-50.) Comparatively, however, only Ms. Fisher observed S.M. at Davidsonville. Further, all five of the AACPS witnesses were qualified as experts in special education. They all then either personally observed S.M. at Summit, or reviewed his extensive records from standardized tests, progress at Davidsonville and Summit, and the various third party examinations. Ms. Kane and Ms. Laymon personally observed S.M. at Summit and were very familiar with the special education resources at Davidsonville. Ms. Donohue and Ms. Heslin, the latter of whom also observed S.M. at Summit, both work with the AACPS Department of Special Education and have experience in the development, implementation, and monitoring of IEPs. (May 19, 2017 Tr. at 14; July 13, 2017 Tr. at 21.) Therefore, the ALJ reasonably determined that the AACPS' witnesses testimony concerning S.M.'s ability to make meaningful progress at Davidsonville given the nature and degree of his disabilities was more credible than the testimony offered by the Plaintiffs. *See E.S. v. Smith*, No. PWG-17-3031, 2018 WL 3533548, at *7 (D. Md. July 23, 2018) ("Indeed, the Fourth Circuit has held that a reviewing court cannot 'reverse a trier of fact, who had the

advantage of hearing the testimony, on the question of credibility.'" (quoting *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 104 (4th Cir. 1991))). Therefore, this Court gives the ALJ's factual findings and credibility determinations due deference. *See M.L.*, 2018 WL 3756722, at *7 ("Because [the ALJ's credibility] reasoning is supported in the record and as the result of an adequate fact-finding process, the Court will accord the ALJ's credibility findings due deference.").

### III. AACPS provided S.M. with a FAPE for the 2014-2015, 2015-2016, and 2016-2017 school years

Presuming the validity of the ALJ's factual findings and credibility determinations, this Court analyzes whether AACPS offered S.M. a FAPE for the 2014-2015, 2015-2016, and 2016-2017 school years. As described above, the Supreme Court has held than an IEP proposed by a local education agency must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. This standard does not "require that a school district provided a disabled child with the best possible education," and "the insistence of parents that a non-public school setting is more appropriate does not establish the inappropriateness of the public school, even if the child would have benefitted more in the private setting." *E.S. v. Smith*, No. PWG-17-3031, 2018 WL 3533548, at *2, 15 (D. Md. July 23, 2018) (quoting *Endrew F.*, 137 S. Ct. at 999). Moreover, "once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second guess the judgment of education professionals." *R.F. v. Cecil Cty. Pub. Sch.*, No. CV ADC-17-2203, 2018 WL 3079700, at *12 (D. Md. June 21, 2018) (quoting *A.B. v. Lawson*, 354 F.3d 315, 326 (4th Cir. 2004)).

The Parents do not argue that the challenged IEPs are procedurally improper. Rather,

the Parents primarily argue that for all three years, S.M. needed—but the IEPs did not provide for—a fully self-contained setting with no time spent in the general education setting. With respect to the third IEP, the Parents further objected to its being implemented at Central Elementary School. In this context, the Plaintiffs argue that the ALJ erred in concluding that S.M. made meaningful progress in AACPS[6] and the ALJ ignored evidence of S.M.'s response to the programming at Summit and struggles at AACPS.

With respect to the Plaintiffs' first argument, to the extent that S.M.'s progress during the 2013-2014 school year is relevant to whether S.M. could have made meaningful progress under the challenged IEPs,[7] S.M.'s report card for the 2013-2014 school year shows that across all subject matters he received fourteen As, ten Bs, six Cs, and one D. (P. Exh. 37.) In terms of expected student behaviors and non-core classes, he received thirty "consistently demonstrates skill," ten "progressing in development of skill," and two "emergency in the development of skill." (*Id.*) Notably during this time, he was receiving 7.5 hours of special education services per week in the co-taught, general education setting and was receiving the various instructional and testing accommodations and several supplementary aids, services, program modifications, and supports. When he underwent a neuropsychological evaluation by Dr. Newman in March of this second grade year, she concluded that S.M. had relative strengths in overall cognitive reasoning/intelligence, language, visual-spatial, and memory abilities. (P. Exh. 17.) Then, when S.M. was promoted to third grade—which he spent at Summit—during the Fall of 2014 Summit reported that he was at a 3.0-3.5 instructional level

---

[6] The Plaintiffs assert that "S.M. Did Not Make Progress in AACPS During The 2014-2015 School Year." This Court interprets Plaintiffs assertion, however, to be directed towards S.M.'s last year with AACPS, the 2013-2014 school year.
[7] As noted above, the Parents were statutorily barred from bringing a Due Process claim regarding S.M.'s IEP for the 2013-2014 school year.

for reading in decoding and comprehension, and that he was reading 3.0 to 3.8 grade level texts. (AACPS Exh. 7.) For these reasons and as described in more detail in the ALJ's factual findings, S.M. made progress during the 2013-2014 school year under his IEP.

Turning to the substance of each challenged IEP, this Court is reminded that "[m]ainstreaming of handicapped children into regular school programs where they might have opportunities to study and to socialize with non-handicapped children is not only a laudable goal but is also a requirement of the Act." *DeVries ex rel. DeBlaay v. Fairfax Cty. Sch. Bd.,* 882 F.2d 876, 878 (4th Cir.1989); *see also M.M. ex rel. J.M. v. Foose*, 165 F. Supp. 3d 365, 369 (D. Md. 2015) (quoting *DeVries*, 882 F.2d at 878). Further, "the school district's 'notions of sound educational policy' are entitled to considerable deference." *E.S. v. Smith*, No. PWG-17-3031, 2018 WL 3533548, at *8 (D. Md. July 23, 2018) (citations omitted); *see also N.P. v. Maxwell*, No. 16-1164, 711 F. App'x 713, 717 (4th Cir. Dec. 8, 2017) ("[I]t is a longstanding policy in IDEA cases to 'afford great deference to the judgment of educational professionals.'")

Each of the challenged IEPs would have provided S.M. with a combination of education in (1) a regular general education setting, (2) a co-taught general education setting, with a general education teacher and a special education teacher providing specialized instruction to special education students, and (3) self-contained pull-out classes. In addition to specifying how much time and for what classes S.M. would be placed in one of those three education settings, the IEPs required that S.M. would receive numerous instructional and testing accommodations and several supplementary aids, services, program modifications, and supports, and occupational therapy. The instructional and testing

accommodations and supplementary aids, services, program modifications and supports were extensive, including large print, human reader or audio recording for selected portions of tests, visual cues, a scribe, respond on test book, monitor test response, visual organizers, extended time, multiple or frequent breaks, reduced distractions, organizational aids, frequent or immediate feedback, copy of teacher/student notes, specialized word processing software, reduced visual cluster, enlarged font, and use of a move and sit cushion and toggle chair. These services were not only provided in the co-taught or self-contained classes, but rather across the educational curriculum. Finally, the IEPs also provided for occupational therapy services pursuant to his Developmental Coordination Disorder.

As S.M. underwent additional tests and his progress at Summit was analyzed, the parties met to review his IEP, update his present levels of performance and goals, and determine what special education services and supplementary aids, services, and supports would enable S.M. to make meaningful progress at AACPS . Year after year, reviewing S.M.'s progress at Summit, on standardized tests, and in the classroom, AACPS increased the time that S.M. spent outside of the regular general education environment. The Parents cannot plausibly claim that ALJ—or AACPS—ignored evidence of S.M.'s progress while at Summit. The ALJ's Decision summarizes S.M.'s teacher's reports and observations, the psychological reports, S.M.'s standardized test results, the various observations of S.M. by other individuals, the specifics of each IEP, and the nine days of witness testimony. Further, as the Parents clarified above, the issue for the ALJ was not whether an environment like Summit was required for S.M. to make meaningful progress; rather, the issue was whether the IEPs proposed for Davidsonville and Central permitted S.M. to make meaningful progress.

The Plaintiffs' main argument is that S.M. required classes with a smaller teacher-student ratio. In fact, they insist that even the November of 2016 IEP, that provided for 15 of the 32 hours per week S.M. spent in school to be in self-contained classes, was insufficient for him to make meaningful progress. In response, the AACPS witnesses testified that the combination of co-taught, self-contained, and general education classes along with the numerous aids and supplements allowed S.M. to make meaningful progress while remaining with his non-disabled peers. The individuals crafting S.M.'s IEPs used their experience and balanced S.M.'s needs to construct a schedule whereby he was provided the instruction he needed in self-contained classes, but was also educated with his non-disabled peers in the regular educational environment with the help of special education teachers and the various accommodations and supplementary aids. Both Ms. Heslin and Ms. Donahue testified that with their experience of placing children in private schools under IEPs, S.M.'s needs did not require private placement. Rather, Ms. Heslin testified that because S.M. was cooperative and easily re-directed, he was an ideal student to be placed in public school with supplementary aid and instruction. Ms. Donahue testified that S.M.'s social and outgoing nature, in addition to his ability to be easily redirected, are not the characteristics of a child who requires private placement outside of an environment with non-disabled peers.

Each IEP provided for S.M. ensured that he received the attention and instruction he needed, through a combination of co-taught, self-contained, and general education classes, while ensuring that he was not unnecessarily removed from the regular educational environment. The testimony of the AACPS witnesses demonstrates that they carefully balanced S.M.'s needs and crafted an IEP that permitted him to make meaningful progress

in the least restrictive environment, as required by the IDEA. *See* 20 U.S.C. § 1415(a)(5) ("[R]emoval of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."). Accordingly, upon a review of the record and as the ALJ explained in his well-reasoned decision, the IEPs and S.M.'s proposed placements at Davidsonville and Central were reasonably calculated to provide him with FAPEs for the 2014-2015, 2015-2016, and 2016-2017 school years. Therefore, this Court upholds the decision of the Administrative Law Judge, and Plaintiffs' Motion for Summary Judgment (ECF No. 11) is DENIED and Defendants' Motion for Summary Judgment (ECF No. 16) is GRANTED.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment (ECF No. 11) is DENIED and Defendants' Motion for Summary Judgment (ECF No. 16) is GRANTED. Judgment is ENTERED in favor of Defendants.

A separate order follows.

Dated: September 14, 2018

_____/s/_____

Richard D. Bennett
United States District Judge